**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| REPRESENTATIVE CHRISTOPHER SHAYS AND REPRESENTATIVE MARTIN MEEHAN, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) ) | Civ. No. 04-1597 (EGS) |
| FEDERAL ELECTION COMMISSION, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) ) | |
| BUSH-CHENEY '04, INC., | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) ) | Civ. No. 04-1612 (EGS) |
| FEDERAL ELECTION COMMISSION, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs, Representatives Christopher Shays and Martin Meehan, and Bush-Cheney '04, filed this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A),(C)-(D), claiming that the Federal Election Commission's ("FEC") failure to issue a rule governing when section 527 groups must register as political committees is arbitrary and capricious.

Plaintiffs ask the Court to remand the case to the FEC to promulgate necessary and appropriate regulations defining the term "political committee" and defining when a 527 group must register as a political committee.

Pending before the Court are the parties' cross Motions for Summary Judgment, defendant's Motion to Strike Plaintiff's Exhibits and Arguments, and defendant's Motion to Strike Amici. A hearing on the motion was held on December 13, 2005. Supplemental briefing was filed on December 19 and 23.  Upon careful consideration of the parties' motions, the responses and replies thereto, oral arguments, the governing statutory and case law, and the entire record, the Court concludes that defendant failed to consider the relevant factors and its decision does not reflect reasoned decisionmaking.  *Prof'l Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1220 (D.C. Cir. 1983).  The Court is not persuaded, however, that the compelling circumstances are present to require defendant to promulgate a rule.  *WWHT, Inc. v. FCC*, 656 F.2d 807, 818 (D.C. Cir. 1981). Rather, this case is remanded to the FEC either to articulate its reasoning for its decision to proceed by case-by-case adjudication or to promulgate a rule if necessary.  Accordingly, plaintiff's motion is **GRANTED IN PART AND DENIED IN PART**, defendant's motion is **DENIED,** and the case is **REMANDED** to the FEC for further proceedings consistent with this Memorandum Opinion.

## I.   BACKGROUND

At issue in this case are groups registered as "527 political organizations" ("527 groups").  These groups receive various tax exemptions from that status, but they do not register as "political committees" under the Federal Election Campaign Act of 1971 ("FECA"), 86 Stat. 11, as amended, 2 U.S.C. § 431 *et seq.* and *Buckley v. Valeo*, 424 U.S. 1 (1976), thereby avoiding various FECA requirements.  Plaintiffs argue that 527 groups have emerged as a new vehicle for raising vast amounts of soft money for the purpose of influencing federal elections.  Plaintiffs contend that the FEC acted arbitrarily and capriciously when it decided, after initiating rule-making, not to issue a rule addressing when a 527 group is captured by the definition of "political committee."  The FEC responds that after considering proposed final rules and the public's comments, it concluded that adopting a rule on this issue was inadvisable and, instead, it would evaluate the status of a 527 group on a case-by-case basis.

### A.   The Parties

Plaintiff Christopher Shays is a member of the United States House of Representatives from the 4th Congressional District of the State of Connecticut.  April 27, 2005, Declaration of Christopher Shays ¶ 1("Shays Decl.").  Representative Shays was first elected in 1987, re-elected in 1988, and every two years thereafter, and next faces re-election in November of 2006.  *Id.*

Plaintiff Martin Meehan is a member of the United States House of Representatives from the 5th Congressional District of the Commonwealth of Massachusetts.  April 27, 2005 Declaration of Martin Meehan ¶ 1 ("Meehan Decl."). Representative Meehan was first elected in 1992, re-elected every two years thereafter, and next faces re-election in November of 2006.  *Id.*  Both representatives were principal House sponsors of the Bipartisan Campaign Reform Act ("BCRA").  First Amended Complaint ("Shays FAC") at ¶¶ 14-15.

Plaintiffs Shays and Meehan are both citizens of the United States, members of Congress, candidates, voters, recipients of campaign contributions, fundraisers, and political party members. Shays Decl. ¶ 3; Meehan Decl. ¶ 3.  In those capacities, each plaintiff is subject to regulation under FECA, BCRA, and the Commission's implementing rules, and their activities are also directly affected by the fact that others, including their potential contributors and supporters, their potential election opponents, contributors to and supporters of their opponents, and contributors to and supporters of both political parties are subject to the same regulation under FECA, BCRA, and the Commission's implementing rules.  *Id.*

If any of the campaign finance laws embodied in FECA and BCRA are subverted, eroded, or circumvented by the FEC's implementing regulations, including its regulation defining the

term "political committee," plaintiffs Shays and Meehan believe they will be forced once again to raise money, campaign, and attempt to discharge their important public responsibilities in a system that is widely perceived to be, and they believe in many respects will be, significantly corrupted by the influence of special- interest money.   Shays Decl. ¶ 4; Meehan Decl. ¶ 4.

Plaintiff Bush-Cheney '04, Inc. ("BC '04") was the principal campaign committee of George W. Bush and Richard B. Cheney for the 2004 general election campaign for President and Vice President of the United States. *See* Def. Mot. for Sum. Jmt., Ex. A and B.   President Bush and Vice President Cheney accepted public funding to finance their 2004 general election campaign. *See* Press Release, "FEC Certifies Public Funds For Bush-Cheney Ticket" (Sept. 2, 2004).   As a precondition for that funding, they agreed, *inter alia*, to accept no contributions, limit their expenditures, and consent to the Commission's conducting a detailed post-election examination and audit of BC '04's finances.   *See* Presidential Election Campaign Fund Act ("Fund Act"), 26 U.S.C. 9001, 9003.   *See also* 11 C.F.R. 9002.11(a)(1), 9004.11, 9007.2(b)(3).   Under the Fund Act, the Commission has until November 2007 — a year after the November 2006 elections — to complete the audit and notify President Bush and BC '04 of any repayments they must make.   *See* 26 U.S.C. § 9007(c) (three-year deadline).   At least until that process is completed, BC '04

remains a publicly financed principal campaign committee for the 2004 general election and cannot convert into a multicandidate political committee.  *See* 2 U.S.C. 432(e)(3); 11 C.F.R. 102.13(c) (multicandidate committee cannot serve as a candidate's principal campaign committee).  President Bush and Vice-President Cheney are not parties to this litigation, nor are Mr. Bush's other political committees, Bush-Cheney '04 (Primary), Inc. and Bush-Cheney '04 Compliance Committee.  Defendant's Statement of Material Facts Not in Dispute ("Def. Statement") at ¶ 9.

Defendant is an agency of the United States with exclusive jurisdiction over the administration, interpretation, and civil enforcement of the Federal Election Campaign Act of 1971 ("FECA").  Def. Statement at ¶ 10.  The FEC is authorized to institute investigations of possible violations of FECA, and has exclusive jurisdiction to initiate civil actions in the United States district courts to obtain judicial enforcement of FECA.  2 U.S.C. §§ 437 g(a)(1)-(2), 437c(b)(1), 437d(e).

**B.   Section 527 Political Organizations ("527 groups")**

Section 527 of the Internal Revenue Code permits income tax exemptions for a "political organization."  26 I.R.C. § 527 (a) ("A political organization shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes.").  A political organization is defined as a "party, committee, association,

fund, or other organization (whether or not incorporated) organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures, or both, for an exempt function." *Id.* at § 527 (e)(1). An "exempt function" is "the function or influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any Federal, State, or local public office or office in a political organization, or the election of Presidential or Vice Presidential electors." *Id.* at § 527 (e)(2). In *McConnell v. FEC*, the Supreme Court construed Section 527 organizations, unlike 501(c) groups, as "organized for the express purpose of engaging in partisan political activity." 540 U.S. 93, 174 n.67 (2003).

### C.   Political Committees

As distinguished from "political organizations," FECA and related campaign finance laws regulate "political committees." 2 U.S.C. § 431(4)(defining "political committee" as "any committee, club, association, or other group of person which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $ 1,000 during a calendar year."). Once an organization is defined as a political committee, it is subject to a host of regulations: it must file a "statement of organization" with the FEC, 2 U.S.C. § 433; file periodic disclosure reports of its receipts and

disbursements, *id.* at § 434; and adhere to contribution limits, *id.* at § 441a-1(a)(1)-(2). A political committee is subject to these regulations even if it is engaged only in spending independent from a particular political party or candidate. 11 C.F.R. § 110.1(n).

The Supreme Court has construed "political committee" only to "encompass organizations that are under the control of a candidate or *the major purpose of which is the nomination or election of a candidate*." *Buckley v. Valeo*, 424 U.S. 1, 79 (1976) (emphasis added). A decade later, the Court held that a group becomes a political committee when its "independent spending become[s] so extensive that the organization's major purpose may be regarded as campaign activity. . . As such, it would automatically be subject to the obligations and restrictions applicable to those groups whose primary objective is to influence political campaigns." *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986).

The *Buckley* test is commonly referred to as the "major purpose" test, and the FEC has never codified it in a regulation. Instead, the FEC has adopted a "case by case" approach or a "gloss" on the regulations. In other words, the FEC includes the test when it interprets and enforces the statute vis-a-vis individual organizations. *See, e.g.*, *FEC v. Malenick*, 310 F. Supp. 2d 230, 234-35 (D.D.C. 2004) *amended on reconsideration*,

8

2005 WL 588222 (D.D.C. Mar. 7, 2005); *FEC v. GOPAC, Inc.*, 917 F. Supp. 851, 851-62 (D.D.C. 1996).

Since the 1970s, Congress has not amended the definition of "political committee" or addressed the application of FECA to section 527 organizations.  Def. Statement at ¶ 12.  Presently, at least two different bills are pending in Congress that would amend the Act to address, for the first time, the circumstances under which section 527 organizations are to be treated as "political committees" under the FECA.  *Id.* at 16.  In the House of Representatives, plaintiffs Shays and Meehan introduced H.R. 513, the "527 Reform Act of 2005," which would amend FECA's definition of "political committee" to include "any applicable 527 organization," which is defined to include a "committee, club, association, or group of persons that . . . is an organization described in section 527."  *Id.*  Plaintiffs' bill would exempt organizations "whose election or nomination activities relate exclusively to . . . elections where no candidate for Federal office appears on the ballot."  See H.R. 513 (as introduced in the House on Feb. 2, 2005).  An identical bill, S. 271, was introduced in the Senate by John McCain and Russ Feingold.  *See* S. 271 (introduced Feb. 2, 2005).  Neither of these proposals has reached the floor of the House or Senate. Def. Statement at ¶ 16.

### D.    FEC's Rulemaking Proceeding

On March 11, 2004, the FEC published a Notice of Proposed Rulemaking ("NPRM"), seeking public comment on a variety of issues involving the definitions of "political committee," "contribution," and "expenditure."  Political Committee Status; Proposed Rule, 69 Fed. Reg. 11,736-60 (March 11, 2004).[1] According to the NPRM, the Commission undertook the rulemaking "to revisit the issue of whether the current definition of 'political committee' adequately encompasses all organizations that should be considered political committees subject to the limitations, prohibitions, and reporting requirements of FECA." *Id.* at 11,736.  The NPRM also requested comments on possible "tests" to determine the "major purpose" of an entity.  NPRM at 11,745-49.

The FEC received more than 100,000 comments from political committees, political parties, non-profit organizations, individuals, campaign finance organizations, and members of Congress.  69 Fed. Reg. 68,056 (Nov. 23, 2005).  Thirty-one

---

[1]In 2001, the FEC issued an Advance Notice of Proposed Rule-making seeking, *inter alia*, "comment on the scope and meaning of the major purpose test" for political committees.  "Definition of Political Committee," 66 Fed. Reg. 13,681 (Mar. 7, 2001)).  Six months later, the Commission voted to hold the rule-making in "abeyance pending changes in legislation, future judicial decisions, or other action." 69 Fed. Reg. 11,736, 11,737 n.3 (March 11, 2004).  The NPRM in the present proceeding stated that "this NPRM is a separate proceeding" from the aborted 2001 rulemaking. *Id.*

witnesses who had submitted written comments testified at public hearings held on April 14 and 15, 2004.  Def. Statement at ¶ 24. Commenters expressed a variety of viewpoints about the definitions of "political committee" and "expenditure," the impact of the proposed tests on political issue advocacy, and the necessity and practicability of a proposed rule.  *Id.*

On August 12, 2004, the FEC considered two separate draft Final Rules that revised the definition of "political committee." Def. Statement at ¶ 34.  Commissioners Thomas and Toner re-introduced their proposed standards governing when a 527 organization was required to register as a political committee (the "Thomas-Toner proposal").[2]  Def. Statement at ¶ 36, FEC

---

[2] The Thomas-Toner proposal stated:

> For purposes of [the "major purpose" test], a committee, club, association or group of persons that is organized under Section 527 . . . has the nomination or election of one or more Federal or non-Federal candidates as its major purpose, unless it is a type of organization described as follows:
>
> (i)   The campaign organization of an individual seeking nomination, election, appointment or selection to a non-Federal office;
> (ii)  A committee, club, association or group of persons that is organized solely for the purpose of promoting the nomination or election of candidates to one or more non-Federal office;
> (iii) A committee, club, association or group of persons whose nomination or election activities relate solely to elections where no candidate for Federal office appears on the ballot;
> (iv)  A committee, club, association or group of persons that is organized solely for the purpose of influencing state ballot initiatives or referenda; or

Agenda Document 04-75-A at 2-3.  General Counsel had also proposed a regulation which would have applied to all groups, including 527 groups.[3]  Def. Statement at ¶ 35.  General Counsel recommended that FEC adopt final rules that would set forth a new regulatory definition of "major purpose" as part of the definition of "political committee" and detailed when 527 groups needed to register.  FEC Agenda Document 04-75 at 37-41.  The proposal contained a multitude of aspirations regarding the regulation of 527 groups.  General Counsel observed, "an organization's decision to avail itself of 527 status is inherently indicative of its choice to engage principally in electoral activity." *Id.* at 14.  The purpose of the draft rules was to "establish practical bright lines to ensure that organizations can predict with a high level of certainty how the Commission will view their various activities, while still providing for a measure of flexibility in appropriate circumstances."  *Id.* at 3.

---

      (v)  A committee, club, association or group of persons that is organized solely for the purpose of influencing the nomination or appointment of individuals to one or more non-elected offices, or the nomination, election, or selection of individuals to leadership positions within a political party.

FEC Agenda Document 04-75-A at 2-3.

   [3] The Commission did adopt two other recommendations made by the General Counsel that did not address the "major purpose" or 527 issues.

The General Counsel advised the Commission "to promulgate a 'major purpose' rule to address certain issues regarding the scope and application of this judicial construct," including "which types of campaign activity counts toward a group's major purpose," and how "'major purpose' may be demonstrated through an examination of the group's fundraising and/or spending . . . [and] a group's public statements." *Id.* at 4-5.  The General Counsel "reasoned that it is eminently fair to impute the purpose of an organization, and therefore the purpose for which it gathers and uses funds, from how the organization describes itself to the public." *Id.* at 7.

In the end, however, both the Thomas-Toner and General Counsel's proposals were rejected by a 4-2 vote.  FEC Minutes, FEC Agenda Document 04-77 (Aug. 19, 2004) at 9.  The FEC published its Explanation and Justification ("E&J") on November 23, 2004, explaining why it took no action to re-define "political committee."  *See* "Political Committee Status, Definition of Contribution, and Allocation for Separate Segregated Funds and Nonconnected Committees," 69 Fed. Reg. 68,056, 68,065 (Nov. 23, 2004).  The Commission reasoned:

> The comments raise valid concerns that lead the
> Commission to conclude that incorporating a "major
> purpose" test into the definition of "political
> committee" may be inadvisable.  Thus, the Commission
> has decided not to adopt any of the foregoing proposals
> to revise the definition of "political committee."  As
> a number of commenters noted, the proposed rules might
> have affected hundreds or thousands of groups engaged

in non-profit activity in ways that were both far-
reaching and difficult to predict, and would have
entailed a degree of regulation that Congress did not
elect to undertake itself when it increased the
reporting obligations of 527 groups in 2000 and 2002
and when it substantially transformed campaign finance
laws through BCRA.  Furthermore, no change through
regulation of the definition of "political committee"
is mandated by BCRA or the Supreme Court's decision in
*McConnell*.  The "major purpose" test is a judicial
construct that limits the reach of the statutory
triggers in FECA for political committee status.  The
Commission has been applying this construct for many
years without additional regulatory definitions, and it
will continue to do so in the future.

*Id.*

## II.  DISCUSSION

Plaintiffs argue that the FEC's decision not to regulate 527
groups was arbitrary and capricious because first, it is self-
evident that 527 groups operate as political committees,
undermining the BCRA's ban on soft money and, second, because the
FEC did not state a reasoned basis for its decision.  Defendants
first respond that the Court has no jurisdiction because
plaintiffs do not have standing and their claims are not ripe.
In response to plaintiffs' challenge regarding the FEC's
decision, the Commission argues that it made a reasoned decision
to evaluate 527 organizations on a case-by-case basis and that
its decision is entitled to deference.

**A.      Standard of Review**

*1.    Summary Judgment*

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56*; Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp.*, 477 U.S. at 324.

Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed.  *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975).  The parties in this case agree that there is no genuine issue of material fact in dispute and, therefore, that it can be resolved by summary judgment.

2.   *Arbitrary and Capricious Review*

When reviewing agency action pursuant to the APA, the Court must determine whether the challenged decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) (holding that an agency's decision to choose either rule-making or case-by-case adjudication is subject to reversal only if the agency committed an "abuse of discretion or a violation of [law].").  In applying the "arbitrary and capricious" standard, a court "may not supply a reasoned basis for the agency's action that the agency itself has not given," *Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983), but a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Id.* (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight System Inc.*, 419 U.S. 281, 286 (1974).

Upon review of an agency's action, the Court must engage in a "thorough, probing, in-depth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971). While the Court's inquiry must be "searching and careful," the standard of review is also a highly deferential one; the agency's actions are "entitled to a presumption of regularity," and the

16

Court cannot "substitute its judgment for that of the agency."[4] *Id.* at 415-16.

Courts in this Circuit have repeatedly recognized that summary judgment is an appropriate procedure when a court reviews an agency's administrative record.  *See, e.g., Bloch v. Powell*, 227 F. Supp. 2d 25, 30-31 (D.D.C. 2002) (citing *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995)).

### B.   Standing

To satisfy the case or controversy requirement under Article III, a plaintiff must show (1) that it has suffered a concrete and particularized injury that is actual or imminent not merely conjectural or hypothetical; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that injury is fairly redressable by a decision of this Court.  *See, e.g., Friends of the Earth v. Laidlaw Environmental Services,* 528 U.S. 167, 180-81 (1992); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)*.*

#### 1.   *Shays and Meehan*

Defendants argue that Shays and Meehan cannot demonstrate a concrete and particularized injury traceable to the FEC's rulemaking and decision to proceed on a case-by-case basis.

---

[4]At oral argument, the parties agreed that no lesser standard of deference is appropriate in this case.  Motions Hr'g Tr. at 19, Dec. 13, 2005 ("Tr. 12/13/05").

In *Shays I*, the D.C. Circuit found that plaintiffs Shays and Meehan had standing to challenge FEC's regulations implementing BCRA. *Shays and Meehan v. FEC*, 414 F.3d 76, 83-95 (D.C. Cir. 2005)(hereinafter "*Shays I*").  The Circuit held that Shays and Meehan's injury was their competitive interests in contests untainted by BCRA-banned practices. *Id.* "[W]hen regulations illegally structure a competitive environment – whether an agency proceeding, a market, or a reelection race – parties defending concrete interests (*e.g.* retention of elected office) in that environment suffer legal harm under Article III." *Id.* at 87.  In the present case, defendant has not provided the Court with any reason to depart from the Circuit's clear statement that "retention of an elected office" is a concrete interest. Therefore, for substantially the reasons detailed by the *Shays I* court, the Court finds that plaintiffs have satisfied the first element of the standing requirements.

Defendants distinguish *Shays I* on the second element, however, arguing that plaintiffs in this case face no risk that an adverse party will cause harm through exploitation of a "safe harbor" created by any "challenged rule."  Plaintiffs do challenge, however, "safe harbors" created by a failure to issue a rule.  Standing can be found if agency **inaction** causes plaintiffs cognizable harm. *See Capital Legal Found. v. Commodity Credit Corp.*, 711 F.2d 253, 258 (D.C. Cir. 1983)

18

("Injury in fact, caused by the substance of an agency's action or inaction, is an essential element of a plaintiff's complaint."); *Univ. Med. Ctr. of S. Nevada v. Shalala*, 5 F. Supp. 2d 4, 7-8 (D.D.C. 1998) ("As a general rule, [w]hen government action or inaction is challenged by a party who is a target or object of that action . . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.")(internal quotation marks omitted)(alterations in original)).  In this case, plaintiffs argue that the FEC's failure to issue a rule created a "loophole" or safe harbor, permitting 527 organizations to raise and spend soft money in ways that will impact plaintiffs reelection campaigns.  This is sufficient to demonstrate causation for standing purposes.

   *2.   Bush-Cheney '04 ("BC '04")*

   The FEC also challenges the standing of BC '04, arguing that because BC '04 filed its claim with only seven weeks before the November 2004 election, no action by the Court could have redressed BC '04's alleged harm before the end of the election. The FEC argues that the doctrine of "capable of repetition yet evading review," as applied in *Johnson v. FCC*, 829 F.2d 157 (D.C. Cir. 1987), is inapplicable in this case because that doctrine relates only to mootness claims.  Here, the FEC does not argue that BC '04's claims are moot, but rather at the time that the action was filed, no Court was capable of redressing any wrong.

Just because defendants have uttered the word "redressibility" instead of "mootness," however, does not change the fact that defendants are raising, at heart, a mootness challenge.  The redressibilty requirement assures that the parties have brought their claims to the appropriate forum. *Florida Audubon Soc. v. Bensten*, 94 F.3d 658, 663 (D.C. Cir. 1996).  In contrast, defendants in this case raise what is essentially a timing issue: there was not enough time to remedy BC '04's in the seven weeks between when the case was filed and the end of the election.  This is a mootness challenge because the end of the election would also mark the end of the justiciable controversy.  Therefore, the appropriate analysis is whether the doctrine of "capable of repetition yet evading review" applies to BC '04.

The Circuit applied this doctrine under virtually identical circumstances in *Johnson v. FCC*, 829 F.2d 157 (D.C. Cir. 1987).  In *Johnson*, the Circuit held that "[e]ven though the 1984 election is now over," a former third-party presidential candidate could challenge the rules governing presidential debates because, "[t]he issues properly presented, and their effects on minor-party candidacies, will persist in future elections, and within a time frame too short to allow resolution through litigation." *Johnson*, 829 F.2d at 159 n.7.  The Circuit did not require the candidate herself to show she could be injured in the future; rather, plaintiff had standing based on

20

"the effects on minority party candidacies." *Id.*

Defendant insists that subsequent case law requires plaintiffs to show "there was a reasonable expectation that the *same complaining party* would be subjected to the *same action* again." *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 633 (D.C. Cir. 2002)(emphasis in original).  This Circuit, however, has not overruled *Johnson*.  Given the unique circumstances of election law, the Court is not persuaded that it should abandon unquestioned and binding precedent in order to follow a case factually dissimilar to the case at bar.  The Court concludes, therefore, that BC '04 has satisfied the requirements for Article III standing.

### C.   Ripeness

To determine whether an administrative action is ripe for review, courts must "evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *National Park Hospitality Ass'n v. Department of Interior*, 538 U.S. 803, 808 (2003) (citation omitted).  Under the first prong, the Court must evaluate "whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final. . . ."  *National Ass'n of Home Builders v. U.S. Army Corp. of Engineers*, No. 04-5221-04-5224 at *8 (D.C. Cir. Feb. 3, 2006)

(internal quotations omitted).  Under the second, the Court must consider "not whether [the parties] parties have suffered any 'direct hardship,' but rather whether *postponing* judicial review would impose an undue burden on them or would benefit the court." *Id.* (internal quotations omitted) (emphasis in original).

The FEC argues that the issue of whether it will apply permissible criteria in enforcing FECA is unfit for judicial review unless and until at least one plaintiff files an administrative complaint.  The issue in this case, however, is not whether the FEC will apply permissible criteria in an individual case, but whether FEC's decision to evaluate compliance with FECA through rulemaking or adjudication was arbitrary and capricious.  Regardless of the concrete circumstances, plaintiffs challenge the FEC's very approach to regulating 527 groups as unlawful.  As such, the ripeness doctrine is inapplicable; plaintiffs' claim "rests not on the assumption that the agency will exercise its discretion unlawfully in applying the regulation but on whether its faithful application would carry the agency beyond its statutory mandate." *Id.* at *10 (internal quotations omitted).

The FEC also maintains that plaintiffs have not demonstrated that they would suffer hardship if the Court does not rule on the merits.  Only if the Court has doubts about the fitness of the issue for judicial resolution, however, must the Court balance the institutional interests in postponing review against the

hardship to the parties that will result from delay.  *Id.* at *10-11.  In this case, plaintiffs' challenge is of a sort routinely brought and adjudicated before the Court, and the Court has no concern about the fitness of this issue for resolution.

D.      **The FEC failed to articulate a reasoned basis for its decision to regulate 527 groups through case-by-case adjudication**

   1.   *FEC's decision*

      Plaintiffs first argue that FEC has not enforced the "major purpose" test either by rulemaking or by case-by-case adjudication.  FEC's thirty year "case-by-case" adjudication policy, plaintiffs contend, has in reality been a policy of failing to regulate 527 groups at all.  Plaintiffs first point to the FEC's actions in 2001, when defendant initiated and conducted a rule-making.  Defendants sought comments on, among other things, "the scope and meaning of the 'major purpose' test for political committees."  Definition of Political Committee, 66 Fed. Reg. 13,681, 13,682 (Mar. 7, 2001).  Despite the concerns[5] that prompted the Commission to begin the 2001 process, FEC decided to hold the rule-making in abeyance.  Plaintiffs then point to the second, "expedited" rule-making begun in early 2004,

_____

[5] *See* Definition of Political Committee, 66 Fed. Reg. at 13,686 n.8 ("the number of 527 organizations is thought to have increased substantially, with a concomitant increase in their spending on federal elections"); *id.* ("Concern remains that Commission action is needed to clarify when an organization becomes a political committee under the FEC . . . The Commission is seeking comment as to how this rule-making should address 527 organizations and organizations that are not yet organized under 26 U.S.C. 527").

which they argue also amounted to nothing.  In addition,
plaintiffs maintain, many complaints filed against 527
organizations have been pending before FEC for over a year, and
that it has failed to rule on any complaints arising from the
2004 campaign.  According to plaintiffs, therefore, the FEC's
track record indicates that the FEC has long known case-by-case
adjudication was ineffective but has done nothing about it.

The FEC counters that its case-by-case adjudication process
is a meaningful one.  It argues that rather than "doing nothing"
after initiating rulemaking in 2004, it made an affirmative
decision to continue to adjudicate 527 groups on a case-by-case
basis.  Its decision not to adopt a final rule was the result of
reviewing the entire record and deciding that a final rule was
not a wise course, and it contends that this decision is well
within its discretion.  The FEC emphasizes that it did not
conclude that 527 groups are not regulated by FECA.  Rather, the
FEC decided to evaluate which 527 groups are required to register
in the concrete setting of the actual activities and
circumstances of each group brought into question, rather than
promulgating in the abstract a rule of general application.  In
further response to plaintiffs' claim that it has "done nothing,"
the FEC points to various regulatory steps it has taken,
including the adjudication of several cases in which it applied
FECA's "political committee" provision to a 527 group.

The Court finds that, although vague, the FEC did articulate

a decision in its E & J to proceed on a case-by-case basis.  The FEC stated that it "decided not to adopt any of the foregoing proposals to revise the definition of 'political committee.'" 69 Fed. Reg. at 68,065.  This can reasonably be construed as a decision not to issue a general rule.  The FEC also stated that it "has been applying [the major purpose test] for many years without additional regulatory definitions, and it will continue to do so in the future."  *Id.*  The Court understands this to mean that FEC chose to continue to conduct determinations of whether a 527 group is a "political committee" via case-by-case applications of the major purpose test.

    2.   *FEC's explanation of its decision*

Having found that the FEC did articulate a decision to determine the status of 527 groups through adjudication rather than rulemaking, the Court next turns to whether FEC provided a reasoned basis for that decision.

The decision of whether to proceed through case-by-case adjudication or by general rule-making lies largely within the agency's discretion.  *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947) ("*Chenery II*") ("the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the agency)[6]; *National*

---

[6]Judge Friendly noted that the *Chenery II* court, while upholding the Commission's decision to issue an individual order, gave the "rather pointed hint" that rule-making is preferable to adjudication. "Since an administrative agency has the ability to make new law prospectively through the exercise of its rule-

*Small Shipments Traffic Conference, Inc. v. I.C.C.*, 725 F.2d 1442, 1447 (D.C. Cir. 1984).

It is possible, however, that an agency's reliance on adjudication can amount to an abuse of discretion. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974). In *Trans-Pac. Freight Conference of Japan/Korea v. Fed. Mar. Comm'n*, the court noted:

> Rule-making is an essential component of the administrative process and indeed is often the preferred procedure for the evolution of agency policies. Rule-making permits more precise definition of statutory standards than would otherwise arise through protracted, piecemeal litigation of particular issues. It allows all those who may be affected by a rule an opportunity to participate in the deliberative process, while adjudicatory proceedings normally afford no such protection to nonparties. And because rule-making is prospective in operation and general in scope, rather than retroactive and condemnatory in effect, interested parties are given advance notice of the standards to which they will be expected to conform in the future, and uniformity of result is achieved.

*Trans-Pac. Freight Conference of Japan/Korea v. Fed. Mar. Comm'n*, 650 F.2d 1235, 1244-45 (D.C. Cir. 1980). Notwithstanding these words of caution against adjudication, however, courts are generally reluctant to second-guess an agency's decision.

Plaintiffs argue that in this case, FEC's choice, in and of itself, to rely on adjudication instead of rulemaking was an abuse of discretion. Plaintiffs principally rely on two cases in

---

making powers, it has less reason (than a court) to rely upon *ad hoc* adjudication to formulate new standards of conduct . . .The function of filling in the interstices of the [Holding Company Act] should be performed, as much as possible, through quasi-legislative promulgation or rules to be applied in the future." *NLRB v. Majestic Weaving Co.*, 355 F.2d 854, 860 (2d Cir. 1966) (*quoting SEC v. Chenery Corp.*, 332 U.S. at 202).

support of their argument.  Plaintiff' Supplemental Brief at 5-8 (Dec. 23, 2005)(citing *Am. Horse Protection Ass'n v. Lyng*, 812 F.2d 1 (D.C. Cir. 1987); *Curry v. Block*, 738 F.2d 1556 (11th Cir. 1984)).  Those cases, however, are inapposite.  In those cases, the Agencies' discretion had already been significantly limited by a direct statutory mandate from Congress to remedy a specific and urgent problem.  In contrast, the BCRA in the present case contains no similar mandate regarding the regulation of 527 organizations.

In *Lyng*, the D.C. Circuit held that the U.S. Department of Agriculture ("USDA") abused its discretion when it denied a petition to initiate a rulemaking and refused to revise its regulations regarding "soring" practices for show horses, a practice banned by the Horse Protection Act.  *Am. Horse Protection Ass'n v. Lyng*, 812 F.2d at 6-7.  The *Lyng* court found that the Act "was clearly designed to end soring" and that remarks by the Secretary of Agriculture "strongly suggest[] that he has been blind to the nature of his mandate from Congress." *Id.* at 7.

In *Curry v. Block*, the Eleventh Circuit held that the Consolidated Farm and Rural Development Act ("CFRA") imposed a mandatory duty on the Secretary of Agriculture to implement, through rulemaking, certain loan servicing and foreclosure avoidance mechanisms.  *Curry*, 738 F.2d at 1562-64.  The Eleventh

Circuit reasoned that, "the urgent need Congress perceived for deferral relief to farmers . . .render it a bit late to begin the accumulation of decisional guides."  *Id.* at 1563 (citing *Matzke v. Block*, 732 F.2d 799, 802 (10th Cir. 1984)(internal quotations omitted)).

Plaintiffs in this case lack the statutory mandate identified by the courts in the Horse Protection Act and the CFRA.  Unlike the Horse Protection Act, which specifically banned soring practices, and the CFRA, which specifically created a deferral relief program, the BCRA does not contain similar requirements regarding 527 organizations.  Rather, plaintiffs raise the more general challenge that 527 groups are circumventing BCRA's "overarching purpose . . . to close soft-money loopholes."  Plaintiffs' Mot. For Sum. Jmt. at 40 (Apr. 28, 2005).  The discretion of the Agencies in *Curry* and *Lyng* was circumscribed by clear mandates in the Acts to address and implement discreet policies.  Here, in contrast, the BCRA places no such parameters on the Agencies treatment of 527 groups.  Therefore, the Court is not persuaded that the Agency's decision to pursue adjudication over rulemaking is, *per se*, an abuse of discretion.

The case of *Common Cause v. FEC*, 692 F. Supp. 1391 (D.D.C. 1987), relied upon by both parties, further illustrates that a statutory mandate is a crucial component to a finding that an agency's reliance on adjudication was arbitrary and capricious.

In *Common Cause*, plaintiffs raised two distinct challenges. First, they argued that FEC's interpretations of sections of FECA pertaining to "soft money" were contrary to law. *Id.* at 1393. Second, plaintiffs maintained that the FEC's denial of plaintiffs' rulemaking petition based on insufficiency of supporting evidence was arbitrary and capricious because the Commission had ample evidence to justify a rulemaking. *Id.* at 1394. On the first challenge, the Court agreed with the plaintiffs, holding that "the agency interpret[ed] its statute in a way that flatly contradicts Congress' express purpose." *Id.* at 1396. In its arbitrary and capricious review, however, the Court held that FEC's decision not to initiate rule-making did not constitute the "exceptional situation of egregious error" required to find the FEC's action arbitrary and capricious. *Id.* at 1397. Thus, the Court remanded the matter to FEC to reconsider its petition for rulemaking.

Here, plaintiffs have only raised the equivalent to the *Common Cause* plaintiffs' second claim. Plaintiffs in this case do not challenge FEC's interpretation of FECA or BCRA. Rather, their sole challenge is on the grounds that there is sufficient evidence on the record to require a rulemaking and, therefore, that FEC's failure to promulgate a rule is arbitrary and capricious. This claim was rejected by the *Common Cause* court, and the Court is not persuaded that the circumstances of this

case present the "exceptional situation" required to reach a different conclusion here.  *Id.*

The Court is troubled, however, by FEC's lack of explanation for its conclusion that adjudication is preferable to rulemaking for regulating 527 groups.  Despite the aid of thirty-one witnesses and 100,000 comments, the single paragraph that comprises the FEC's reasoning meekly notes what appear to be only three reasons that rulemaking "may be inadvisable": (1) "the proposed rules might have affected hundreds or thousands of groups engaged in non-profit activity in ways that were both far reaching and difficult to predict"; (2) the regulations "would have entailed a degree of regulation that Congress did not elect to undertake itself when it increased the reporting obligations of 527 groups in 2000 and 2002 and when it substantially transformed campaign finance laws through BCRA"; and (3) "no change through regulation or definition of 'political committee' is mandated by BCRA or the Supreme Court's decision in *McConnell*." 69 Fed. Reg. at 68,065.

These "reasons," while perhaps sufficient to summarize the complexities of rulemaking, do not explain why adjudication avoids these or additional complexities.  Indeed, the only conclusion that can be drawn from this reasoning is that the regulation of 527 groups is complicated.  The Court does not disagree with that conclusion.  What the E & J fails to explain, however, is how the problem becomes any less complicated or any

more manageable if the FEC pursues case-by-case adjudication.

The E & J does not, for instance, discuss whether First Amendment or due process concerns might impair its ability to bring enforcement actions against 527 groups in the absence of a regulation providing clear guidance as to when those groups must register as a political committee.  In fact, FECA provides a defense to "any person" who relies in "good faith" on FEC rules. 2 U.S.C. § 438(e).  The FEC also did not discuss whether, or why, case-by-case adjudication would be more effective than a rule at preventing the flow of soft money into federal campaigns. Indeed, judging from FEC's track record in the 2004 election, case-by-case adjudication appears to have been a total failure.

The FEC also did not explain how piecemeal adjudication could be executed on a sufficiently timely basis to be effective. The FEC's track record indicates the opposite is true.  Cases arising from the 2004 campaign have languished on the Commission's enforcement docket for as long as 23 months, with no end in sight, even as the 2006 election campaign has begun. Indeed, the Commission itself emphasizes that it has no legal obligation to bring a case to the close in an election cycle. *See* FEC Supp. Br. at 3 n.2.  This merely demonstrates the patent inadequacy of the case-by-case approach.  The FEC can take years to complete an administrative action, and penalties, if they come at all, come long after the money has been spent and the election decided.

Nor did the Commission discussed whether the adjudication of individual cases that are resolved on particular facts and legal theories would be effective as a means to provide guidance to 527 groups generally.  For instance, the *Club for Growth* complaint recently filed by the Commission seeks to require one 527 group to register as a political committee.  Yet the Commission's complaint is based entirely on facts specific to the activities and statements of that one group, and depends in no way on the group's status as a "political organization" under section 527. Even if the Commission wins the case, it would likely have no bearing on any other group registered under section 527.

In short, the Commission asks the Court to defer to its decision to proceed by adjudication yet fails to explain why the Court should do so.  The Commission's only response is that FEC authorizes the agency to decide matters by enforcement actions (or decide advisory opinions) on a case-by-case basis.  FEC Supp. Br. at 8-9.  This truism is beside the point: so too, the FECA authorizes the Commission to promulgate rules.  *See* 2 U.S.C. § 437d(a)(8).  The question, therefore is not whether the Commission has statutory authority to bring enforcement actions, but whether it acted rationally here by refusing to promulgate a rule in favor of its purported preference for piecemeal adjudications to enforce the FECA and BCRA prohibitions on the spending of soft money in federal elections.  The Commission's failure to provide a reasoned explanation is simply fatal here

under hornbook administrative law. *E.g.*, *Chamber of Commerce v. FEC*, 69 F.3d 600, 606 (D.C. Cir. 1995) (finding arbitrary and capricious a final rule which provided "no explanation" for "differential treatment" of union members and farm cooperatives); *Williams Natural Gas*, 872 F.2d at 450 (remanding where agency failed to offer a satisfactory explanation for termination of rulemaking proceeding); *Am. Wildlands v. Norton*, 193 F. Supp. 2d 244, 251 (D.D.C. 2002) (remanding where the agency "entirely failed to consider an important aspect of the problem") (internal quotation omitted).

**E.    The circumstances are not sufficiently compelling for this Court to require the FEC to promulgate a rule**

Plaintiffs seek an order directing the FEC to promulgate a rule defining the term "political committee" and when a 527 group must register as a political committee.  This remedy, however, is reserved for "only the rarest and most compelling of circumstances."  *See American Horse Protection Association v. Lyng*, 812 F.2d 1, 7 (D.C. Cir. 1987) (quoting  *WWHT,* 656 F.2d at 818).  Such circumstances are not present here.  Rather, the more appropriate remedy is to remand the case to the agency to explain its decision or institute a new rulemaking.  *Id.*

**IV.  CONCLUSION**

For the foregoing reasons, the Court concludes that the FEC has failed to present a reasoned explanation for its decision that 527 organizations will be more effectively regulated through

case-by-case adjudication rather than general rule.  Therefore, plaintiffs' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART,** defendant's motion is **DENIED,** and the case is **REMANDED** to the FEC for further proceedings consistent with this Memorandum Opinion.  An appropriate Order accompanies this Memorandum Opinion.

      **Signed:**    **Emmet G. Sullivan**
                **United States District Judge**
                **March 29, 2006**